BARRETT S. LITT, SBN 45527
Email: blitt@kmbllaw.com
RONALD O. KAYE, SBN 145051
Email: rok@kmbllaw.com
LINDSAY BATTLES SBN 262862
Email: lbattles@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

PETER NEUFELD, *pro hac vice*
Email: peter@nsbcivilrights.com
NICK BRUSTIN, *pro hac vice*
Email: nick@nsbcivilrights.com
ANNA BENVENUTTI HOFFMANN, *pro hac vice*
Email: anna@nsbcivilrights.com
KATIE MCCARTHY, *pro hac vice*
Email: katie@nsbcivilrights.com
NEUFELD, SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10012
Phone No. (212) 965-9081
Fax No. (212) 965-9084

Attorneys for Plaintiff CRAIG COLEY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG COLEY,<br><br>    Plaintiff,<br><br>    vs.<br><br>VENTURA COUNTY; WILLIAM HANEY, SR.; ESTATE OF FREDERICK A. JONES; JAMES HENDERSON; EDWARD VASQUEZ; | **CASE NO. 2:18-cv-10385-PA-JDE**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1) **42 U.S.C. § 1983 FOR DEPRIVATION OF DUE PROCESS OF LAW AND VIOLATION OF RIGHT TO A** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JAMES SCHWARZ; SANDRA
TAYLOR; SHANIN SULLIVAN;
SANDRA VANNI; NORM FORT;
AND DOES 1–10, INCLUSIVE,

Defendants.

**FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT**

2) **42 U.S.C. § 1983 CIVIL RIGHTS CONSPIRACY CLAIM**

3) **42 U.S.C. § 1983 CLAIM PURSUANT TO *BRADY, GARCIA*, and *MOODY* FOR FAILURE TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE**

4) **42 U.S.C. § 1983 CLAIM FOR POST-TRIAL SUPPRESSION OF EXCULPATORY EVIDENCE**

5) **42 U.S.C. § 1983 SUPERVISORY LIABILITY CLAIM**

6) **42 U.S.C. §1983 *MONELL* VIOLATIONS**

7) **NEGLIGENT SUPPRESSION/WITHHOLDING OF EVIDENCE**

8) **CALIFORNIA CODE § 815.2 FOR RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY INCLUDING FOR NEGLIGENT SUPERVISION AND TRAINING**

9) **CALIFORNIA CODE § 52.1**

**DEMAND FOR JURY TRIAL**

The Plaintiff Craig Coley, by and through his attorneys, Neufeld Scheck & Brustin, LLP, and Kaye, McLane, Bednarski & Litt, allege as follows:

## INTRODUCTION

1.     Craig Coley spent nearly thirty-nine years wrongfully imprisoned for a brutal double murder he did not commit.

2.     On November 22, 2017, after four decades of wrongful incarceration, Mr. Coley received an extraordinary pardon from California Governor Jerry Brown recognizing his actual innocence: "I grant this pardon because Mr. Coley did not commit these crimes." The Ventura County District Attorney's Office and the Simi Valley Police Department ("SVPD") similarly recognized, based on DNA testing, that Mr. Coley was innocent of the underlying murders.

3.     On November 11, 1978, Rhonda Wicht and her four-year-old son, Donald Wicht, were brutally murdered. SVPD Detective Robert Klamser ("Klamser") was assigned as the lead investigator. From the outset, Klamser was assisted in the investigation by officials and employees from the Ventura County District Attorney's Office and the Ventura County Sheriff's Department (collectively, "Defendants").

4.     Shortly after arriving on the scene, SVPD officers interviewed witnesses who reported hearing disturbances from the victims' apartment beginning around 4:30 a.m. the night before. At that time, Mr. Coley was miles away at a Howard Johnson's restaurant unwinding with other employees after a shift. Despite having an incontrovertible alibi—corroborated by multiple witnesses—Mr. Coley was arrested on the afternoon of November 11, 1978.

5.     From the moment of his arrest, Mr. Coley maintained his innocence and cooperated with Ventura County and Simi Valley employees, waiving his rights and providing voluntary saliva and blood samples. Mr. Coley also consented to a search of his apartment and his vehicle.

6.      No physical or forensic evidence linking Mr. Coley to the crime was discovered on his person, the clothing he had been seen wearing the night before, or in his vehicle.

7.      Between his airtight alibi and the utter lack of physical or forensic evidence linking him to the crime, it quickly became apparent that Mr. Coley did not commit these heinous murders.

8.      But Klamser—a rogue officer with a history of setting up suspects—was determined to implicate Mr. Coley in this crime. To that end, Klamser conspired with Defendants to procure Mr. Coley's wrongful conviction by engaging in unconstitutional conduct, including but not limited to planting incriminating evidence in Mr. Coley's apartment, coercing and pressuring a key witness to change the reported time of the crime from 4:30 a.m. to 5:30 a.m. to get around Mr. Coley's alibi, fabricating a false identification of Mr. Coley's vehicle, suppressing exculpatory evidence, and engaging in other reckless investigatory misconduct.

9.      Mr. Coley's first trial in 1979 ended in a hung jury. Hundreds of community members signed a petition protesting the investigation, and the judge who presided over that trial stated he could not imagine a guilty verdict based on the evidence he had seen.

10.     But, on the basis of false representations and exculpatory evidence withheld by Defendants and others, the Ventura County District Attorney's Office remained committed to the prosecution. At Mr. Coley's second trial, he was wrongly convicted of the Wicht murders and subsequently sentenced to life imprisonment without parole.

11.     For the next four decades, Mr. Coley continued to proclaim his innocence and fight for his freedom. In 1989, decorated SVPD Detective Michael Bender ("Bender")—an officer with no preexisting ties to Mr. Coley—became convinced based on his review of the case that Mr. Coley was innocent. Between 1989 and 2017, Bender repeatedly informed Ventura County officials and

2

employees of the evidence of Mr. Coley's innocence. But Ventura County officials and employees not only took no action to assist Mr. Coley, they made false representations that substantially prolonged his wrongful incarceration.

12.    In 1993, Klamser was fired from SVPD for having framed a fellow police officer using the same unconstitutional techniques he applied in Mr. Coley's case. Ventura County officials and employees knew of the circumstances of Klamser's termination and his unconstitutional investigative practices. Nevertheless, they continued to stand behind Mr. Coley's conviction, including opposing his repeated requests for DNA testing and, critically, falsely and baselessly representing that no physical evidence or forensic samples capable of being tested still existed.

13.    Decades later, after the Governor ordered Mr. Coley's case be reinvestigated in 2016, the new investigator was able to immediately locate the "destroyed" physical evidence. That evidence was promptly tested and definitively excluded Mr. Coley as the perpetrator. Based on this testing and the reinvestigation, Ventura County officials and employees concluded that Mr. Coley was factually innocent of the crimes.

14.    On November 22, 2017, Mr. Coley was released from prison after Governor Brown granted his petition for clemency and issued an executive pardon. One week later, on November 29, 2017, the Ventura County Superior Court issued an order finding Mr. Coley factually innocent of the crimes and vacated his convictions. The Ventura County District Attorney's Office joined in both motions on that date.

15.    Shortly after his release, Mr. Coley received a personal apology letter from William Maxwell, the Deputy District Attorney who prosecuted his case. Mr. Maxwell stated: "I am profoundly sorry for what happened to you and for my role in it. . . . They say you are a man of high character. Even though that's true, I don't ask for your forgiveness for this horror. It's too much."

16.   Mr. Coley was 31 when he was first arrested and 70 when he was released from prison; he lost virtually the entirety of his adult life to wrongful imprisonment, including his opportunities to have a family and establish a career. An only child, Mr. Coley lost both of his parents during his horrific ordeal. He was deprived of the ability to care for his father and mother in their old age and felt responsible that they had to spend their savings—money taken from his father's law enforcement pension—to pay for his legal fees.

17.   The intentional and reckless acts and omissions of various officers and employees of the Ventura County District Attorney's Office and the Ventura County Sheriff's Office—acting in concert with Klamser and various other SVPD officers—caused Mr. Coley to be wrongly convicted for the murders of Rhonda Wicht and Donald Wicht and to remain wrongly imprisoned for decades thereafter for these crimes.

18.   Absent the actions of Defendants and their co-conspirators, Mr. Coley would not have been wrongly convicted for the Wicht murders on January 3, 1980; would not have been sentenced to life imprisonment without parole on February 26, 1980; would not have lost his subsequent appeals; would have had access to forensic material exculpatory material decades earlier; and would have secured a release from his wrongful imprisonment while he still had life ahead of him, instead of spending over thirty-nine years wrongly incarcerated.

19.   As a direct result of Defendants' misconduct, Mr. Coley suffered injuries and damages including bodily and personal injuries; pain and suffering; mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation of himself and his family; degradation; restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, and family relations.

20.   Mr. Coley now seeks redress for the egregious misconduct that cost him the best years of his life.

4

**JURISDICTION AND VENUE**

21.   This action is brought by Craig Coley ("Plaintiff" or "Mr. Coley")
pursuant to 42 U.S.C. §1983.

22.   This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of
the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983,
and under 28 U.S.C. §1331.

23.   The acts, errors, and omissions complained of all took place within the
Central District of California. Therefore, venue lies in this District pursuant to 28
U.S.C. §1391(b)(2).

**JURY DEMAND**

24.   Plaintiff demands a trial by jury on all issues and claims set forth in this
Complaint pursuant to the Seventh Amendment of the United States Constitution
and Federal Rule of Civil Procedure 38(b).

**PARTIES**

25.   Plaintiff Craig Coley resided within the jurisdiction of the State of
California at all times herein alleged.

26.   Defendant Ventura County is, and at all times herein alleged was, a
public entity organized and existing under the laws of the State of California. The
Ventura County District Attorney's Office and the Ventura County Sheriff's Office
are, and at all times herein alleged were, agencies of Ventura County.

27.   At times relevant herein, Defendant William Haney was a Deputy
District Attorney at the Ventura County District Attorney's Office acting under
color of law. For the conduct regarding Mr. Haney alleged herein, he was acting in
either an investigative or administrative capacity and was not acting in a
prosecutorial capacity. He is sued in his individual capacity.

28.   Upon information and belief, Frederick A. Jones is deceased. At all
relevant times herein Frederick A. Jones was a Deputy District Attorney with the
Ventura County District Attorney's Office acting under color of law. During the

time Frederick A. Jones was investigating Mr. Coley's case, he acted outside the
scope of his prosecutorial duties and was functioning in an investigatory capacity.
Defendant Estate of Frederick A. Jones is entitled to defense and indemnification by
Ventura County. California Probate Code § 550 *et seq.* permits claims directly
against an indemnified estate without the need to join the decedent's personal
representatives or successor in interest as a party. To the extent that a personal
representative or successor in interest is a necessary party, the identity of that person
is currently unknown to Plaintiff and is sued herein as a Doe Defendant.

29.   At all times relevant herein, Defendants James Henderson and Edward
Vasquez were Investigators employed by the Ventura County District's Attorney's
Office acting under color of law. They are sued in their individual capacities.

30.   At all times relevant herein, Norm Fort[1] was a Criminologist at the
Ventura County Sheriff's Crime Laboratory acting under color of law. He is sued in
his individual capacity.

31.   At all times relevant herein, James Schwarz, Sandra Taylor, Shanin
Sullivan, and Sandra Vanni were officers of the Ventura County Sheriff's
Department acting under color of law. They are sued in their individual capacities.

32.   Plaintiff is informed and believes and thereon alleges that Defendants
sued herein as Does 1 through 10, inclusive, were employees of Ventura County,
and were at all relevant times acting in the course and scope of their employment
and agency and under color of law. Each Defendant is the agent of the other.
Plaintiff alleges that each of the Defendants named as a "Doe" was in some manner
responsible for the acts and omissions alleged herein, and Plaintiff will ask leave of
this Court to amend the Complaint to allege such names and responsibility when
that information is ascertained.

---

[1] Formerly Norma Fort.

6

## GENERAL ALLEGATIONS

33.    Plaintiff is informed and believes, and herein alleges that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and with Klamser and other employees and agents of the Simi Valley Police Department, and in taking the actions hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

34.    Each paragraph of this Complaint is expressly incorporated into each cause of action that is a part of this Complaint.

35.    The acts and omissions of the Defendants were malicious, callous, oppressive, wanton, reckless, grossly negligent, negligent, and/or deliberately indifferent with respect to the rights of Mr. Coley.

I.    **AGENTS AND EMPLOYEES OF VENTURA COUNTY WERE AWARE THAT KLAMSER ROUTINELY ENGAGED IN UNCONSTITUTIONAL CONDUCT AND WAS UNFIT TO BE AN SVPD OFFICER**

36.    Robert Klamser was the lead SVPD detective in the Wicht murder case, for which Mr. Coley was wrongfully convicted. Immediately prior to joining the SVPD, Klamser was rejected by the Los Angeles Police Department as psychologically unfit to be a police officer. He was nevertheless hired by SVPD in 1976, only a year thereafter. Klamser then served as an SVPD officer and detective for nearly 20 years until he was terminated based on his history of unconstitutional practices dating back to before the Wicht murders and because he was determined to be psychologically unfit to serve as a police officer.

37.    By 1978, with less than two years of experience as an officer, Klamser was assigned to the position of lead detective—including in the high-profile Wicht double homicide—despite the fact that it was widely known within the SVPD that he routinely engaged in unconstitutional conduct, including manufacturing and using false evidence, withholding evidence, and manipulating evidence to establish

7

guilt against those he considered guilty of crimes. In that capacity, he worked frequently with officials and employees of the Ventura County District Attorney's Office ("VCDAO"), including prosecutors and investigators, and the Ventura County Sheriff's Office ("VCSO"), including deputies and criminologists.

38.   On information and belief, it was well known within the Ventura County District Attorney's Office and the Ventura County Sheriff's Office, including by the Defendants named herein, that Klamser routinely engaged in unconstitutional conduct, including manufacturing and using false evidence, withholding evidence and manipulating evidence to establish guilt against those he considered guilty of crimes. Nonetheless, said Defendants regularly used and relied on false evidence presented by Klamser without adequately investigating and verifying the evidence he presented. Similarly, said Defendants assumed without any or adequate inquiry or investigation that Klamser had produced to them all exculpatory evidence.

## II.      THE WICHT MURDERS

39.   During the early morning hours of November 11, 1978, Rhonda and Donald Wicht were attacked and murdered in their apartment by an as-yet unidentified male assailant or assailants.

40.   The attack on the Wichts began at or before 4:30 a.m., as neighbors heard loud screams coming from their apartment at that time. Rhonda Wicht was raped, beaten, and strangled to death with her body left on her bed; her 4-year-old son Donald was smothered and asphyxiated in his bed. The assailant(s) continued their attack for at least an hour, ultimately leaving at approximately 5:30 a.m.

41.   The night she was murdered, Ms. Wicht was expecting at least one male visitor: James Ireton, a man she had been seeing and who frequently partied at her apartment with two other men, Robert Bowyer—Ms. Wicht's cousin—and David Mobley. A neighbor also told SVPD officers at the outset of the investigation that Ms. Wicht was expecting all three men the evening she was murdered. None of these men had alibis for the time of the murder. Ireton said he planned to go to Ms.

Wicht's apartment but then decided at the last minute to drive to Los Angeles where he "drove around" and neither went anywhere in particular nor saw anyone. His fingerprints were found on a whiskey bottle and on the inside of the kitchen window in Ms. Wicht's apartment. Bowyer similarly had no alibi, claiming he was asleep in his own room at the time of the murder after having been out drinking that night. But semen found underneath Ms. Wicht's body on her bloody bedsheet was determined to have come from a man with Type "O" blood. Bowyer is a Type "O" secretor.

42.   At the time of the murders, Mr. Coley was miles away at a Howard Johnson's surrounded by co-workers until past 4:00 a.m. He then offered to drive a co-worker home around 4:30 a.m. and was nowhere near the Wicht apartment when these heinous murders were taking place. In addition to his airtight alibi, Mr. Coley is a Type "A" secretor and so could not have been the source of the semen found under Ms. Wicht's body. Rhonda Wicht was Mr. Coley's friend and sometimes girlfriend, and four-year-old Donald Wicht was like a son to him. As DNA testing has now conclusively shown, Mr. Coley had nothing to do with these horrible crimes and was truly devastated by their murders.

## III.   VENTURA COUNTY DEFENDANTS CONSPIRE WITH KLAMSER TO IGNORE EXCULPATORY EVIDENCE AND MANIPULATE INCULPATORY EVIDENCE TO PROSECUTE AND WRONGFULLY CONVICT MR. COLEY

43.   The bodies of Rhonda and Donald Wicht were discovered on the morning of November 11, 1978. Police responded to the scene at approximately 11:00 a.m. and promptly interviewed several neighbors, including Glenn Watkins.

44.   Mr. Watkins, who lived directly downstairs from the Wichts, told Officer Bingaman, in the presence of another SVPD officer, that he had been awakened by screaming from Rhonda's apartment at 4:30 a.m.

45.   Klamser reported to the scene shortly after and despite having been on the force for less than two years was assigned as lead detective on this brutal double

homicide. VCSD Criminologist Fort and Deputy Taylor were present with Klamser on the scene for the duration of the day. Employees and officials from the VCDAO were also present and in close contact with Klamser throughout the day.

46.    Despite his incontrovertible alibi and no forensic evidence or witnesses linking him to the crime, Mr. Coley was wrongly accused and arrested for the Wicht murders within hours of the bodies being discovered. His wrongful arrest was due to the fabrication or withholding of evidence and other investigative misconducted committed by Defendants, acting both individually and in concert with Klamser and other SVPD officers not named herein.

47.    By the afternoon of November 11, 1978, Klamser and Ventura County officials and employees—including Deputy District Attorney William Maxwell and DA Investigators Henderson and Vasquez—were aware that Mr. Coley had an irrefutable alibi until at least 4:45–5:00 a.m. Mr. Coley himself told SVPD officers and DDA Maxwell that he had been at the Howard Johnson's with several witnesses until 4:30 a.m., and then gave a bus boy a ride home after that.

48.    Contemporaneously, upon hearing of Mr. Coley's arrest for the Wicht murders, Stanley Stoneburg, the manager of that Howard Johnson's restaurant, reached out to provide officials with the exact same information. In a tape-recorded interview at 2:00 p.m. on November 11, 1978—less than a half hour after Mr. Coley's wrongful arrest—Mr. Stoneburg independently confirmed that Mr. Coley left the Howard Johnson's at 4:30 a.m., then drove a bus boy home from work. The bus boy, Miguel Almanza Ayala, was then interviewed by DA Investigator Vasquez and confirmed this exact sequence of events: that he had punched out his timecard at 4:30 a.m., and that Mr. Coley gave him a ride home because it was raining that night.

49.    Less than two hours after learning Mr. Coley had an alibi until at least 4:45 –5:00 a.m., meaning time of death was a critical fact in the investigation, VCSO Criminologist Fort, Deputy Taylor, and Klamser had Rhonda and Donald's

bodies removed from the crime scene and entered the apartment to collect physical and forensic evidence. Despite ample opportunity to do so, Fort and Taylor failed to collect even the most basic information necessary to determine time of death such as ambient air temperature and body temperature. Nor did Fort or Klamser—both of whom were present at the autopsy of Rhonda Wicht—direct or request the Ventura County Medical Examiner to estimate time of death. Defendants were fully aware when they declined to take these basic investigative steps of the exculpatory value of that information to Mr. Coley.

50.   For the duration of the collection of physical and forensic evidence from the crime scene on November 11, 1978, Criminologist Fort, Deputy Taylor, and Klamser were the only individuals inside, as SVPD officers had secured the scene and were logging every individual's entry and exit. The collection efforts lasted nearly five hours, during which time Fort, Taylor, and Klamser were together. Upon information and belief, Klamser with the help and/or knowledge of Defendants Fort and Taylor removed a key piece of physical evidence from the Wicht apartment: a Mickey Mouse T-shirt belonging to Donald Wicht that was visibly stained with blood and other substances. The presence of this shirt and its removal was not documented in any reports or evidence inventories prepared by Fort or Taylor from their search of the Wicht apartment on November 11, 1978.

51.   On November 12, 1978, Klamser prepared an affidavit for entry into Mr. Coley's apartment. At the time he prepared the affidavit, Klamser and Defendants were well aware that Mr. Coley had an alibi at the time of the murders that had been corroborated by other witnesses. Klamser deliberately omitted these exculpatory details from his affidavit for a search warrant. Defendants knowingly or recklessly allowed and relied on Klamser's affidavit without taking any steps to correct these material omissions or to otherwise ensure that the court reviewing the affidavit was apprised of the full circumstances and known evidence regarding the Wicht murders and Mr. Coley.

52.   VCSO Criminologist Fort, Deputy Schwarz, and Klamser executed the search warrant of Mr. Coley's apartment in the afternoon of November 12, 1978. Defendants and Klamser were the only individuals inside Mr. Coley's apartment and were together for the duration of that search. No blood or physical evidence was located on any of Mr. Coley's clothing, including the clothing that he was seen wearing until at least 4:40 a.m. the morning of the murder. Recognizing that Mr. Coley had both an airtight alibi and no physical or forensic evidence linking him to the murder, on information and belief, Klamser planted the stained Mickey Mouse T-shirt from the Wicht apartment into the middle of a pile of Mr. Coley's laundry. On further information and belief, Defendants Fort and Schwarz either assisted Klamser in so doing or were aware of Klamser's planting or other improper handling of the T-shirt and recklessly disregarded it. Fort and Schwarz then helped cover up the planting of this incriminating evidence by falsely reporting in written and oral reports to the prosecutor that the Mickey Mouse T-shirt was discovered by law enforcement in Mr. Coley's apartment near the bottom of a pile of laundry.

53.   VCSO Defendants Fort, Schwarz, and Taylor also accompanied Klamser on additional unlawful searches including of Mr. Coley's vehicle on November 13 and of Mr. Coley's apartment again on November 16. They were or should have been aware of Klamser's material omissions and distortions of the evidence contained in the affidavits that formed the basis of the searches in which they participated. Defendants and Klamser found no evidence whatsoever tying Mr. Coley to the crime, including any inculpatory physical or forensic evidence. No such evidence was found during the search of Mr. Coley's vehicle.

54.   At that point, Mr. Coley had been arrested but Defendants and Klamser were faced with a dearth of true evidence implicating him as well as compelling alibi evidence. Defendants recognized that they had no case against Mr. Coley and so conspired with Klamser to manipulate the evidence to support a prosecution and ultimately a conviction and life sentence—events which marred Mr. Coley's life

forever. Upon information and belief, the misconduct engaged in by Klamser and Defendants, acting both individually and in concert, included but is not limited to:

a.   Taking one of 4-year-old Donald Wicht's T-shirts from the crime scene—which was visibly stained with semen and blood—and planting it among the evidence collected from Mr. Coley's home the next day.

b.   Falsely representing in written and oral reports that the T-shirt had been found in Mr. Coley's apartment at the bottom of his dirty laundry rather than taken from the crime scene.

c.   Suppressing hair and other forensic evidence that tended to exculpate Mr. Coley and inculpate likely perpetrators Ireton and Bowyer.

d.   Coercing, manipulating, and fabricating a statement from Glenn Watkins by getting him to change the time at which he had reported to multiple SVPD officers first hearing screams from the Wicht apartment from 4:30 a.m. (when Coley had an airtight alibi) to 5:30 a.m. DA Investigator Henderson—both individually and in conjunction with Klamser—conducted multiple unrecorded interviews of Mr. Watkins concerning the critical time at which Mr. Watkins heard screams from the Wicht apartment. Those interviews were not taped, not memorialized in handwritten notes, and not documented in any formal reports. It was only after Mr. Watkins changed the reported time to 5:30 a.m. that DA Investigator Henderson recorded that interview on January 15, 1979. In a post-trial interview, Mr. Watkins stated that he first heard screams at 4:30 a.m. and that he had never told investigators otherwise. DA Investigator Henderson never disclosed this exculpatory information.

e.   On information and belief, DA Investigators Henderson and Vasquez also made promises to Watkins prior to his trial testimony in exchange for him testifying falsely against Mr. Coley, which evidence was never

disclosed. On information and belief, these promises included expungement of Mr. Watkins's record to provide his altered evidence.

f.    Destroying, suppressing, and/or failing to test exculpatory physical and forensic evidence that was to be tested and retained by the Ventura County Sheriff Office's Crime Laboratory both prior to and after Mr. Coley's conviction.

g.    Ignoring, withholding, or otherwise, recklessly failing to investigate evidence inculpating other more likely suspects, including but not limited to Defendant DA Investigator Vasquez having interviewed another witness, Barbara Williams-Barone, who said that Rhonda Wicht was expecting three men at her apartment that night—Bowyer, Ireton, and Mobley—all of whom had spent time with the victims just prior to the murders, all of whom were connected to the murder scene via forensic and fingerprint evidence, and none of whom had alibis.

h.    Suggesting, coercing, and fabricating an identification of Mr. Coley's truck from another neighbor and witness, Debbie Villafranca. Ms. Villafranca was a notoriously unreliable and biased witness: a drug dealer and user who claimed she peeked out from her curtains during the pre-sunrise hours of a rainy night, while not wearing her glasses, and saw Mr. Coley's truck leaving the apartment. Although Ms. Villafranca never looked at a clock at the time, she later estimated she saw this truck leaving around 5:30 or 6:00 a.m. However, Ms. Villafranca was unable to identify a photo of Mr. Coley's truck taken in broad daylight when presented in a photo line-up. Nor could she identify the sound of Mr. Coley's truck—which she claimed was unique and known to her—when played a tape recording of his truck's engine. On November 17, 1978, Defendant DDA Jones—acting in an investigatory capacity—directed Klamser to conduct an incredibly suggestive "reenactment" to procure an identification of Mr. Coley's truck—

14

including having Mr. Coley's vehicle brought to the scene, towing a vehicle from the place he was informed it had been the night of the crime, and placing Mr. Coley's truck within Ms. Villafranca's line of sight in a manner it physically could not have been on the night of the murders. Only through this suggestion and manipulation were Defendants and Klamser able to obtain a completely unreliable identification of Mr. Coley's truck from Ms. Villafranca.

i.     Upon information and belief, DA Investigators Henderson and/or Vasquez coerced and/or threatened Ms. Villafranca's testimony at Mr. Coley's trial.

j.     Fabricating evidence from Bonnie Castillo, Mr. Coley's landlady, to support a fantastic story by asserting that Mr. Coley had disposed of certain inculpatory evidence after Defendants' searches of Mr. Coley's home and vehicle with Klamser failed to uncover any such inculpatory evidence. Klamser, in concert with certain Defendants, hypothesized that Mr. Coley had stolen Ms. Castillo's car, driven that car to a nearby pond and disposed of his clothing and other criminal evidence there. This theory was advanced even though it was known to Klamser and Defendants what Mr. Coley was wearing at 4:30 a.m. on the night of the murders, and these clothing items were in Mr. Coley's apartment and collected there by Defendants Fort and Schwarz, and none had any forensic evidence on them. At Klamser's direction, the Ventura County Search and Rescue Team searched the pond. No evidence was located. Nevertheless, in support of this illogical theory, Klamser and DA Investigator Vasquez conducted interviews of Ms. Castillo and falsely reported that (1) Ms. Castillo had identified a Volkswagen key on Mr. Coley's keychain, which had allegedly been misplaced, as a key belonging to her husband; and (2) that this key fit the ignition on Ms. Castillo's Volkswagen. Ms. Castillo had in fact stated only that one of the

keys "looked like" a key to her old house, and it was known that the
Volkswagen key fit Mr. Coley's ex-wife's car, not Bonnie Castillo's. Given
his involvement in the investigation, Investigator Vasquez knew or should
have known that this information was false.

55.    Either sufficient or just cause to arrest and/or prosecute Mr. Coley never
existed, or such cause was lost at some point prior to Mr. Coley's trial or retrial
which ended in his conviction in 1980. The charges against him, and the evidence
presented to justify them, were the product of Defendants' use of manipulated, false
and fabricated evidence, and suppression of exculpatory evidence.

56.    On information and belief, Defendants and Klamser decided
immediately, and without proper investigation, that Mr. Coley was guilty of the
Wicht murders. When the evidence did not support this theory because Mr. Coley
was innocent and had an ironclad alibi for the time of the murders, Defendants
conspired with Klamser to suppress and destroy exculpatory evidence throughout
the investigation, and openly take other wrongful actions throughout the
investigation, at trial, at sentencing, and afterwards to convict him, to secure a life
sentence without parole, and to ensure Mr. Coley would never be released from his
imprisonment after conviction.

57.    Mr. Coley truthfully proclaimed his innocence during the investigation
and throughout his imprisonment. He cooperated with authorities from the
beginning, waiving his *Miranda* rights, consenting to searches of his property, and
providing a true and verifiable alibi.

58.    Because of the lack of evidence against him, Mr. Coley's first trial ended
in a hung jury on April 13, 1979.

59.    Hundreds of community members insisted on Mr. Coley's innocence,
including signing petitions insisting on a fair and adequate investigation into the
murders—unfortunately to no avail. Mr. Coley had no criminal record prior to his
conviction and had always been gainfully employed. The judge who presided over

16

the first trial was reported as saying he could not imagine a guilty verdict based on the evidence presented at that trial. Nevertheless, in reliance on the false information provided by Defendants and their co-conspirators, the VCDAO reinstituted criminal charges and retried Mr. Coley later in 1979.

## IV.   MR. COLEY IS WRONGFULLY CONVICTED

60.   Defendants, in conjunction with Klamser, continued to engage in wrongful investigatory misconduct after the first trial ended. Despite the fact that Ventura County had exculpatory evidence and impeachment evidence that would have saved Mr. Coley from conviction, Ventura County officials and employees wrongfully withheld this evidence from Mr. Coley and his attorney in 1979 and 1980. As a result, Mr. Coley could not prove his innocence and the retrial ultimately ended in a conviction on January 3, 1980.

61.   When Mr. Coley—an innocent man—was found guilty, he sustained shock. Being wrongfully convicted of a crime he did not commit caused Mr. Coley great physical illness and great mental anguish. The January 3, 1980 wrongful conviction was an event that forever defamed his character and humiliated him publicly. Whether Ventura County expected or intended to convict an innocent man or to cause these grave injuries, Ventura County is nonetheless legally responsible because Mr. Coley's conviction was ultimately the result of the County's deliberate indifference or reckless policies and procedures, its failure to train and supervise its employees, and/or its negligent hiring and/or supervision.

## V.   MR. COLEY IS WRONGFULLY SENTENCED TO LIFE IMPRISONMENT WITHOUT PAROLE

62.   After conviction but before sentencing, Mr. Coley and his attorneys sought impeachment and exculpatory evidence that would have mitigated any sentence.

63.   However, Ventura County officials and employees, in concert with Klamser, continued to wrongfully withhold exculpatory and impeachment evidence

in their possession despite requests from his attorneys and continued cries from the community that Mr. Coley was innocent and should not be punished.

64.    Ventura County and the individual Defendants thereby acted with deliberate indifference, recklessness, or negligence in failing to provide Mr. Coley exculpatory evidence or other evidence of his good character, and instead defamed him to the sentencing court and to the public.

65.    As a result, on February 26, 1980, the Superior Court of Ventura County denied Mr. Coley's application for probation, and instead ordered Mr. Coley to serve two concurrent life sentences without the possibility of parole based on Ventura County's submissions.

66.    As a result of this event, Mr. Coley was devastated and locked up for life with dangerous people who wanted to and did do harm to him, causing Mr. Coley grievous injuries in subsequent years. Mr. Coley's February 26, 1980 sentencing was an event that forever invaded Mr. Coley's right to live a private life.

67.    Whether or not Ventura County expected or intended that an innocent man would be sentenced to life in prison without the possibility of parole, or to cause the injuries that Mr. Coley sustained, Ventura County is nonetheless legally responsible for his life sentence because it was ultimately the result of Ventura County's deliberate indifference or reckless policies and procedures, its failure to train and supervise its employees, and/or its negligent hiring and/or supervision.

## VI.    VENTURA COUNTY DESTROYS AND SUPPRESSES EXCULPATORY EVIDENCE WITH FULL KNOWLEDGE OF MR. COLEY'S ENTITLEMENT TO SUCH EVIDENCE

68.    Mr. Coley continued to assert his innocence and relentlessly seek release from his horrific situation, filing numerous post-conviction appeals, post-conviction motions, petitions for writ of habeas corpus, and petitions for clemency throughout his decades of wrongful imprisonment. Ventura County employees and officials knew of these efforts and the basis for them because Mr. Coley and his attorneys

continued to reach out to Ventura County and request the physical exculpatory evidence and impeachment evidence in their possession.

69.    Despite Ventura County employees and officials' knowledge of these efforts, and despite the knowledge of certain Defendants that there was physical and documentary evidence that could establish Mr. Coley's innocence, on October 16, 1985, an Order for Disposition of Criminal Evidence was filed in the Superior Court of California in Ventura County, with Ventura County's knowledge and consent, which included an order to destroy all physical evidence from the Wicht murder case. On November 26, 1985, over 500 pieces of physical evidence—including exculpatory evidence that could have demonstrated Mr. Coley's innocence—was destroyed without notice to Mr. Coley or his attorney. On information and belief, certain of Ventura County's agents and employees as described above were, or should have been, aware that there was a likelihood that the destroyed physical evidence contained exculpatory evidence, such destruction exhibited a reckless disregard for Mr. Coley's rights and the truth (and were at least negligent).

70.    Ventura County and/or various of the Defendants, or both, are liable for this wrongful destruction and its failures to inform Mr. Coley and his attorneys of its impending destruction. Ventura County is also liable for failing to preserve critical evidence and failing to intervene in the destruction of that evidence because it had explicit notice of Mr. Coley's attempts to secure his release. This failure to intervene was especially egregious in light of Ventura County and individual Defendants' growing knowledge that Klamser routinely fabricated inculpatory evidence and suppressed exculpatory evidence in his investigations.

71.    On September 19, 1986, Mr. Coley filed a petition for post-conviction relief that sought materials and exculpatory evidence in Ventura County's possession that would have proved his innocence and released him from his wrongful imprisonment. Even despite its destruction of exculpatory physical evidence, Ventura County employees and officials were aware of and/or easily able

locate exculpatory forensic evidence responsive to Mr. Coley's request, as that forensic evidence remained stored in the same private laboratory that VCSO employees sent the evidence to in 1979 for testing. Upon information and belief, Ventura County employees and officials willfully concealed the location of and/or recklessly failed to do even the most minimal search which would have revealed the location of this exculpatory forensic evidence to which Mr. Coley was legally and constitutionally entitled. As a result, Ventura County violated Mr. Coley's right to rely on this evidence to support his post-conviction motion for release, and his habeas petition was denied on January 7, 1987.

72.   Mr. Coley appealed that denial less than a month later, on February 26, 1987. Again, Ventura County knew of Mr. Coley's efforts to overturn his appeal but breached its legal and constitutional obligations to turn over the evidence and/or the location of that evidence despite knowing and/or being able to easily determine the location of that evidence since 1979. The actions, inactions, errors, and/or omissions taken by Ventura County employees and officials during this time ensured that Mr. Coley would once again lose his appeal. His appeal was denied on April 1, 1987, causing Mr. Coley to suffer continued wrongful imprisonment, mental anguish, embarrassment, humiliation, emotional distress, defamation of character, and violation of property rights.

73.   In 1988, Mr. Coley's father, Wilson Coley—a retired Los Angeles Police Department officer—died of a heart attack. Because Mr. Coley was wrongly incarcerated, he could not be by his father's side when he passed, could not attend his funeral, and could not bury him. Mr. Coley's father passed away before he could see his only son exonerated and freed from prison. This devastating loss and deprivation of familial relationships with his father and grieving mother caused Mr. Coley to suffer extreme and severe mental anguish, anxiety, shock, and humiliation because of the wrongful actions of Ventura County and its officials and employees.

**VII.    VENTURA COUNTY IGNORES OR SUPPRESSES CLEAR
EVIDENCE OF MR. COLEY'S ACTUAL INNOCENCE,
INCLUDING EVIDENCE OF KLAMSER'S PRACTICE OF
FRAMING INNOCENT INDIVIDUALS**

74.   In 1989, Michael Bender, a decorated SVPD officer with no ties to Mr.
Coley, began looking into the investigation of the Wicht murders because of
Klamser's growing reputation in the Department for investigatory misconduct,
including fabricating inculpatory evidence and suppressing exculpatory evidence.

75.   Beginning in 1989, Bender reported Klamser's unlawful and unethical
behavior to SVPD Chief Paul Miller and to the City Attorney. During this same time
period, SVPD was internally investigating Klamser's conduct in criminal
investigations. In December 1989, SVPD Chief Boyce sent Klamser a Notice of
Intended Disciplinary Action, which required him to submit to medical and
psychological testing. Upon information and belief, certain Ventura County officials
and employees—including the Ventura County District Attorney—were aware at
that time of Bender's investigation and Klamser's growing reputation for
unconstitutional conduct but took no action on Mr. Coley's case.

76.   As part of Bender's efforts to reinvestigate the Wicht murders, he re-
interviewed witnesses and jury members in September 1990. These interviews and
his review of Klamser's case file established that Mr. Coley was innocent and that
Klamser, in concert with Defendants, had framed him. Bender continued to inform
Ventura County and Simi Valley officials about Klamser's misconduct, but his
efforts were ignored or suppressed by County officials and employees. At that time,
Ventura County District Attorney Michael Bradbury and several Ventura County
Deputy District Attorneys and investigators were aware of Bender's efforts to free
an innocent man. Not only did these Ventura County officials and employees not
look into or assist Bender in his re-investigation, McGee went directly to Klamser,
who by then had been promoted to Lieutenant, to warn him of Bender's efforts on
September 13, 1990.

77.    Without knowledge that the County was regularly discussing Mr. Coley's case, in October and November of 1990, Bender sent letters to City Hall, the City Manager, the Mayor, and the Attorney General informing them that Klamser used unlawful means and deliberately discriminatory tactics to close cases in Simi Valley. Bender continued to urge Ventura County and Simi Valley officials to realize that false arrests and convictions had happened and were continuing to happen because of Klamser's actions, and that Bender now had proof that Mr. Coley was innocent.

78.    All Bender asked for was an impartial investigation into Klamser's unlawful behavior, but despite his evidence and Klamser's infamous reputation, no Ventura County official took any action. Ventura County also, yet again, failed to provide Mr. Coley with the exonerating evidence and impeachment evidence learned about after his conviction. Instead, Ventura County buried or otherwise failed to act on this information, despite the crystal-clear evidence that Mr. Coley was innocent or, at a minimum, that the prosecution and investigation should be reopened.

79.    Because Ventura County officials and employees had alerted SVPD to Bender's re-investigation, on September 19, 1991, SVPD Chief Miller formally ordered Bender to cease and desist with investigating the Wicht murders, Mr. Coley's innocence, and Klamser's misconduct or face immediate suspension or termination from the Simi Valley police force. By engaging in this conduct, Ventura County and its officials and employees interfered with, hindered, undermined and prevented Mr. Coley's ability establish his innocence and pursue legal remedies available to him.

80.    Ventura County's repeated failure to investigate Mr. Coley's innocence, and its undermining and obstructing of his efforts to exonerate himself, were intentional or in reckless disregard of their legal and constitutional obligation to provide Mr. Coley with exculpatory evidence of his innocence rather than actively

suppressing that evidence. As a result, Mr. Coley remained in prison because Ventura County refused to use the exculpatory and impeachment information provided by Bender to secure his release.

81.   At best, Ventura County's actions were negligent, reckless or indifferent to Mr. Coley's safety and rights, and at the most they were intended to keep an innocent man behind bars to protect the County's reputation—as evidenced by County officials going immediately to Klamser and the SVPD to have Bender cease his reinvestigation. Additionally, the failure of Ventura County to disclose extensive information of Klamser's misconduct prevented Mr. Coley and his attorneys from fully investigating and undermining the evidence Klamser had fabricated to convict Mr. Coley of a double homicide.

82.   On November 18, 1992, Klamser falsely arrested Paul Nolan (another SVPD police officer), whom he knowingly framed. An investigation into this false arrest finally led to Klamser's placement on administrative leave in February 1993—more than two years after Bender was threatened with termination and after he ultimately was forced to leave the Department once the VCDAO alerted SVPD to his efforts to prove Mr. Coley's innocence. Ventura County officials and employees were aware of the false arrest of Nolan and Klamser's misconduct in that investigation.

83.   In February 1993, the Simi Valley Public Defender's Office filed a complaint against Klamser for withholding exculpatory evidence and sought his personnel file on the basis of his history of "falsely arresting people, writing false reports, or withholding facts in investigations." Ventura County officials and employees were aware of this complaint.

84.   Once placed on leave, Klamser was evaluated by Dr. Green, a psychiatrist hired by Simi Valley. On November 17, 1993, Dr. Green concluded that Klamser was psychologically unfit to serve as a police officer due to pre-existing personality disorders such as Paranoid Personality Disorder and Narcissistic

Personality Disorder. That month, Klamser was placed on an unpaid leave of absence, ordered to surrender his pistol, ID, and badge, and SVPD personnel were informed that he was not allowed on the premises without an escort. On June 30, 1994, SVPD notified Klamser that he was mentally incapacitated and forced him to retire. SVPD not only knew that Klamser was "unfit" but also knew that Dr. Green's report concluded that he framed Paul Nolan, , pursued the conviction, and deliberately used exculpatory facts to alert the alleged victim that police knew she had been lying—the exact same tactics Bender had told Ventura County officials Klamser employed against Mr. Coley in the murder investigation. Upon information and belief, Ventura County officials and employees were aware of and/or involved in SVPD's evaluation and ultimate termination of Klamser.

85.   Even after a retained expert found Klamser was, and always had been, unfit to serve as a police officer, and that *every* case in which he had been involved was potentially tainted, Ventura County did not advise persons (which it was legally and constitutionally required to do), including Mr. Coley, that his conviction was potentially tainted, nor did it take *any* steps to reinvestigate Mr. Coley's case or to look into the clear evidence of innocence in its possession. Instead, Ventura County actively resisted requests to re-examine Mr. Coley's prosecution for years. Ventura County's actions, errors, inactions, omissions, policies, and/or procedures resulted in Mr. Coley's inability to prove his innocence and secure his release.

86.   Mr. Coley filed another habeas corpus petition on April 22, 1997, in the Supreme Court of the State of California, but it was denied because Ventura County suppressed the now mountains of evidence of Mr. Coley's innocence and the growing impeachment evidence against Klamser. Ventura County is liable for failing to report or reveal that information to Mr. Coley, to his attorneys, or to the post-conviction courts, which would have secured Mr. Coley's release from his horrific ordeal.

87.    On November 15, 2009, Mr. Coley applied for clemency from the Governor of California for the first time. Mr. Coley's application stated that he was requesting clemency because of his wrongful conviction, that his legal means had been thwarted due to evidence destruction, and that his ailing mother needed help.

88.    Despite Ventura County's knowledge of Mr. Coley's petition for release and its ability to aid in the process by turning over exculpatory evidence and impeachment evidence regarding Klamser known to the County, Defendants once again failed Mr. Coley by continuing to conceal exculpatory evidence regarding the Wicht murders and Klamser's extensive misconduct, resulting in the denial of his clemency application.

89.    In direct response to Mr. Coley's clemency petition, Glen Kitzmann, the Deputy Chief Investigator at the District Attorney of Ventura County's office, sent a letter to the Board of Parole Hearings on January 20, 2010 stating:

> Upon review of his application it was determined that Mr. Coley is currently serving a life without the possibility of parole sentence for murder from a 1978 case. We have also been notified of a claim that potential problems may have occurred during the investigation of the original case.

> At this time, we are unable to support Mr. Coley's request for clemency. We are conducting a review of the case to determine the validity of the claim of problems in the initial investigation that could affect the conviction. Upon completion of that review we would be in a better position to make a final determination as to Mr. Coley's request for clemency.

90.    Ventura County thus not only condoned but had its employee participate in the sending of letters to the Board of Parole in connection with Mr. Coley's post-

conviction petitions, which letters contained disparaging and misleading statements designed to ensure Mr. Coley would never be granted early release. It was not until almost a year later on September 9, 2011, that the Deputy District Attorney notified Bender that the Governor's office closed out Mr. Coley's clemency petition.

91.  This means that, despite knowledge on the part of Ventura County officials and the Ventura County District Attorney's Office about Klamser's investigatory misconduct, his preexisting personality disorders, and his fabrication and suppression of exculpatory evidence in Mr. Coley's case, and the role that certain Defendants played in that misconduct, these Ventura County officials claimed that further review was still necessary and then never completed that review, instead failing to disclose and/or actively suppressing evidence directly bearing on Mr. Coley's innocence that should have been considered by the parole board in 2010-2011.

92.  In addition to the denial of his clemency petition and while remaining in jail for a crime he did not commit, that same year—in 2011—Mr. Coley's mother passed away. Mr. Coley begged in his clemency application that his mother needed help because of her ailing health, which Ventura County was further made aware of through Bender's efforts. Because of Ventura County's continued withholding of exculpatory evidence and its active endeavor to keep Mr. Coley behind bars, Mr. Coley was not there by his mother's side when she needed him; he could not attend her funeral, and he could not be there to bury her. Mr. Coley—an only child with no children of his own—lost his last direct relative without any opportunity to say goodbye. Losing his mother while in prison, on top of losing his father, deprived Mr. Coley of the strongest familial relationship he had before prison and caused Mr. Coley to suffer extreme and severe mental anguish, anxiety, shock, and embarrassment because of the wrongful actions of Ventura County, its officials, and employees.

93.   At no point during or after Mr. Coley's applications for clemency did any Ventura County official or employee come forward with the exculpatory evidence known to them, including evidence that had been in their possession for over a decade.

94.   Ventura County officials and employees, in conjunction with Klamser and other Simi Valley officers and officials not named herein, actively concealed this and other exculpatory evidence with explicit notice that Mr. Coley's legal and constitutional rights, including his right to use this evidence to prove his innocence in a clemency application, would be violated.

## VIII.   VENTURA COUNTY WITHHOLDS DNA EVIDENCE TO WHICH MR. COLEY WAS ABSOLUTELY ENTITLED AND WHICH WOULD HAVE EXONERATED HIM DECADES EARLIER

95.   In 2000, the state of California passed Cal. Pen. Code § 1405 giving convicted individuals a liberty interest in having evidence DNA-tested in order to exonerate them. Under the statute, a convicted person's right to DNA evidence became absolute: "Notwithstanding any other provision of law, the right to file a motion for postconviction DNA testing provided by this section is absolute and shall not be waived."

96.   Pursuant to this statute, Mr. Coley filed a motion in 2002 requesting that the physical and forensic evidence found at the scene of the Wicht murders be tested, specifically, for DNA evidence. Mr. Coley's motion specified that this evidence was most likely in the possession of the Ventura County Sheriff's Office.

97.   Deputy District Attorney William Haney was assigned to respond to Mr. Coley's DNA request. On March 3, 2003, he filed a response opposing Mr. Coley's request on the basis that "the evidence at issue [was] no longer possessed by the agencies," specifically the Ventura County Sheriff's Office and SVPD. DDA Haney also informed Mr. Coley in his response that the original file from the District Attorney's office was "lost" or destroyed without explanation.

98.   When DDA Haney contacted the VCSO regarding the existence of any physical and forensic evidence from the Wicht case, on information and belief, VCSO Property Room Officer Sandra Vanni and DNA Lab Supervisor Shanin Sullivan represented that they had conducted a thorough inventory of the VCSO and discovered only very small reference blood stains—from Mr. Coley and victim Donald Wicht—with no evidentiary value. Sullivan further represented that she had found "the paperwork for the evidence that had been processed at that time," yet still was unable to locate any physical or forensic evidence.

99.   DDA Haney responded to Mr. Coley's request for DNA by stating that the evidence was no longer in the County's possession and that therefore the motion to re-test evidence should be denied. Mr. Coley requested DNA testing on numerous occasions from 2003 through 2017 but was told over and over again by Ventura County that there was no forensic evidence to be tested.

100. But after the Governor ordered that Mr. Coley's case be re-investigated in 2016, the detective assigned to re-investigate the case was able to locate all the crucial forensic evidence that had been sent by the VCSO to a private laboratory for testing in 1979. It took that detective less than two days and a single phone call to track down and locate this evidence—which had been stored by the same company (under a new name), at the same address, with the same general contact information since 1979. The forensic evidence he easily located included samples of semen taken from the bedsheet found under Rhonda Wicht's body, the samples taken from the stained Mickey Mouse T-shirt belonging to Donald Wicht, and other key pieces of forensic evidence that, once tested, exonerated Mr. Coley as the perpetrator of these crimes.

101. Ventura County, including Ventura County employees DDA William Haney, Shanin Sullivan, and Sandra Vanni, at best, failed to conduct even the most minimal search for this evidence or, alternatively, intentionally misrepresented that no such evidence could be located and/or was in its possession. In fact, the Ventura

County Crime Lab either possessed or knew the location of forensic evidence from the Wicht murders capable of being tested, as that evidence had been stored in the exact location it was sent to by the VCSO in 1979 for the past four decades. Had Ventura County employees, including DDA William Haney, Shanin Sullivan, and Sandra Vanni, actually looked for that evidence any of the numerous times the information was requested after 2003, they would have found it. This reckless and grossly negligent conduct on behalf of Ventura County is inexcusable and could have easily been avoided had they not been actively trying to suppress evidence of Mr. Coley's innocence for decades.

102. Ventura County and its employees and official's nonfeasance, misfeasance, and failure to take the time to look for DNA evidence, despite Mr. Coley's repeated requests and statutory entitled to that evidence, is outrageous and grossly negligent. Ventura County's refusal to lift a finger to help Mr. Coley establish his innocence through DNA testing, for over a decade, caused him to continue to rot in prison until finally, in October of 2016, the Governor ordered that Mr. Coley's case be re-investigated by the Board of Parole Hearings.

103. Mr. Coley lost fourteen more years of his life in prison because of Ventura County and its employees and official's negligence and failure to act, causing him countless mental and physical injuries and preventing him from caring for his ailing mother and being present when she passed away.

104. Based upon Ventura County's repeated misrepresentations that there was no forensic evidence to be tested, Mr. Coley's DNA testing requests were consistently denied, and his ability to get relief for the crimes he did not commit was again thwarted by Ventura County officials' actions and inactions. These intentional misrepresentations and/or this reckless failure to search prohibited Mr. Coley from securing his freedom throughout the 2000s, for which Ventura County and its officials and agents are liable.

105. On December 9, 2013, Mr. Coley again applied for Clemency from the Governor of California. Finally, in 2016, the Governor ordered a re-investigation of the Wicht murders and Mr. Coley's innocence. After the Governor's 2016 order, the Ventura County District Attorney's Office, the City of Simi Valley, and SVPD submitted to a re-examination of the evidence against Mr. Coley, including subjecting evidence from the crime scene to DNA testing. That DNA testing demonstrated Mr. Coley's innocence, showing that key evidence used to convict Mr. Coley did not have his DNA on it and instead had the DNA of other individuals. The re-investigation also included a review of the thousands of pages of records, and newly conducted interviews, which further supported Mr. Coley's innocence.

106. On information and belief, after the 2016 / 2017 testing of the samples of the semen extracted from the sheet found under Rhonda Wicht's body, and the blood and semen found on Donald Wicht's T-shirt, DNA results matched other individuals who were initially suspects to the murders. Rather than pursue these individuals as suspects and assess whether the forensic samples matched their blood and semen, Klamser and the Defendant investigators either deliberately, with reckless disregard or with deliberate indifference, ignored these individuals as possible suspects at the time of the initial investigation. These actions were consistent with their planting of evidence, manipulating witnesses' accounts of the crime, and in furtherance of their malicious efforts to hold Mr. Coley responsible for the murders regardless of the lack of evidence linking him to the crime, his law-abiding history, and his complete alibi.

107. At the end of the re-investigation, the Ventura County District Attorney's Office finally admitted that Mr. Coley was factually innocent.

108. On November 22, 2017, the Governor granted an incredibly rare full pardon on the basis of Mr. Coley's factual innocence. The Governor noted that "[t]he grace with which Mr. Coley has endured this lengthy and unjust incarceration is extraordinary" and ordered him released from prison "immediately."

109. The grant of a pardon based on innocence by the Governor is an extraordinary event. Few pardons are provided annually (normally under 200 out of a prison population of well over 100,000 people), and virtually all pardons are for people who have already served their sentence and led an exemplary post-prison life; these are not pardons because they are found factually innocent.

110. On November 29, 2017, the Superior Court of the State of California for the County of Ventura issued an order pursuant to Cal. Penal Code § 851.8 finding Mr. Coley factually innocent of the Wicht murders. That same day, the Superior Court issued another order vacating Mr. Coley's conviction pursuant to Cal. Penal Code § 1473.7. The Ventura County District Attorney's Office joined in both motions on that date.

111. Ventura County was aware of all of Mr. Coley's post-conviction appeals, motions, petitions, and clemency applications and the basis for each of them. However, the County failed to provide, concealed, suppressed, or destroyed exculpatory evidence in connection with the wrongful investigation. Ventura County officials and employees learned that Klamser's investigations were improper and were presented information establishing that Mr. Coley was indeed innocent and was being wrongfully imprisoned. Ventura County and its officials had legal and constitutional duties to give Mr. Coley exculpatory and impeachment evidence in their possession and to assist him in securing his early release. At best Ventura County is liable for its inactions and nonfeasance in breaching its obligations to do so, and at worst is liable for the actions of its officials and employees in actively burying, concealing, and destroying the evidence of Mr. Coley's innocence causing him to rot in prison for over thirty-nine years. Throughout his horrific ordeal, officials at the Ventura County District Attorney and the Ventura County Sheriff's Office failed in their supervisory capacities to expose and remedy the unconstitutional conduct of their subordinates, about which they knew or should have known.

112. Ventura County is legally responsible for not only the reputational injuries that Mr. Coley suffered at the time of his conviction and the devastation at his sentencing, but also for the discrete injuries that Mr. Coley sustained because of his continued wrongful imprisonment and his inability to free himself despite the fact that his innocence became obvious to Ventura County. Ventura County's inaction and misfeasance was the direct and proximate cause of his continued wrongful imprisonment for decades and the bodily injuries, mental anguish, mental distress, sickness, disease, assaults and batteries, and other injuries that Mr. Coley sustained from his exposure to prison conditions.

113. The discrete bodily and personal injuries which Mr. Coley sustained and his civil rights—which were violated every day he was wrongfully imprisoned— were the foreseeable consequences of Ventura County's misconduct, and these numerous injuries (some life-threatening) were actually and proximately caused by Ventura County's actions or the actions of those for whom Ventura County is liable.

114. With the blatant evidence of Klamser's misconduct, and the misconduct of individual Defendants, in both Mr. Coley's case and others, Ventura County had a legal obligation to reopen and reinvestigate Mr. Coley's conviction and to help him secure his release through his post-conviction efforts (which they explicitly knew about), but Ventura County officials and employees either concealed the evidence or failed to act. Indeed, Ventura County actively resisted Bender's dogged efforts to re-examine Mr. Coley's case for decades, until shortly before his ultimate exoneration, and intentionally and/or recklessly failed for decades to locate and turn over forensic evidence that would have conclusively proved Mr. Coley's innocence.

115. Indisputably, Ventura County is liable for its wrongful actions, and Ventura County is liable for the bodily injuries, assaults and batteries, and numerous other injuries Mr. Coley sustained in prison.

/ / /

/ / /

## IX.    PARTICIPATION, STATE OF MIND, AND DAMAGES

116. All Defendants acted without authorization of law.

117. Each Defendant individually, jointly, and/or in concert and conspiracy participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

118. As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

119. Each Defendant acted individually, jointly and/or in concert with the other Defendants and others not named in violating Mr. Coley's rights.

120. Each Defendant acted with a deliberate indifference to, or reckless disregard for, or with negligence towards Mr. Coley's rights by fabricating inculpatory evidence, ignoring exculpatory evidence of which they were aware, and/or failing to conduct a constitutionally adequate investigation.

121. The individual Defendants named herein, in engaging in the acts described, were not acting in a prosecutorial capacity but in an investigatory, administrative or supervisorial capacity.

122. As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Mr. Coley sustained the injurious events of his wrongful conviction, his sentencing to life imprisonment without parole, the denial of his multiple appeals, and numerous discrete bodily and mental injuries throughout his imprisonment. Throughout Mr. Coley's wrongful imprisonment, new and independent injuries were sustained for which the Defendants are directly responsible, including but not limited to: Mr. Coley's inability to grieve the loss of familial relations when his father died in 1988 and when his mother died in 2011; the denial of all Mr. Coley's habeas corpus petitions and appeals; and the destruction and/or suppression of evidence which could have

exonerated Mr. Coley and released him from his wrongful imprisonment decades earlier.

123. As an actual and proximate result of thirty-nine years of confinement in a prison cell and exposure to prison conditions, Mr. Coley also contracted a wide range of painful, embarrassing, humiliating, and potentially deadly diseases, including Bowen's disease, seborrheic keratosis, pityriasis lichenoides chronica, focal lymphoid aggregates, and perivascular lymphocytic infiltrate, resulting in constant rashes, swelling and itching of his skin, oozing sores and lesions, scarring, and other infirmities. The extreme mental distress and anguish brought about by Mr. Coley's wrongful imprisonment caused him to suffer from high blood pressure and develop ulcers. Mr. Coley also suffered numerous other bodily injuries while wrongfully incarcerated which were further exacerbated by poor conditions and inadequate medical treatment, including head injuries, burning of his arms and legs and infected blisters, laceration of his scalp, a morbidly enlarged prostate, a meniscal tear, glaucoma, food poisoning resulting in vomiting and diarrhea, and injuries to his face and legs. Notably, while incarcerated, Mr. Coley contracted Hepatitis C. The poor conditions of his imprisonment and the inadequate treatment provided caused Mr. Coley's Hepatitis C to progress, developing into fibrosis of the liver and potentially cancer.

124. While imprisoned, Mr. Coley also sustained assaults, batteries, and other injuries which nearly killed him. For instance, towards the end of 1980, Mr. Coley was severely beaten by a group of prison neo-Nazis for his refusal to join their group. In another event, Mr. Coley's teeth were knocked loose, and he was not given adequate dental care in prison. As a result, he lost many teeth and sustained incredible physical pain and embarrassment to this day. Ultimately, Mr. Coley had to have all of his teeth removed and replaced by dental implants in a 16-hour intensive surgery with a lengthy recovery time.

125.  Whether or not Ventura County intended or expected an innocent man would be convicted or sentenced to life or to inflict the injuries that Mr. Coley sustained throughout his horrific ordeal (including during his arrest, prosecution, conviction, sentencing, post-conviction filings and efforts to obtain DNA testing), Ventura County—through its actions, errors, omissions, misfeasance, and nonfeasance—is responsible for the great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension which Mr. Coley sustained.

126. Throughout Mr. Coley's ordeal—including during his arrest, prosecution, conviction, sentencing, post-conviction filings and efforts to obtain DNA testing—Ventura County and the individual Defendants acted with deliberate indifference, recklessness, or negligence in failing to provide Mr. Coley exculpatory evidence or other evidence of his good character or that would actually or potentially exonerate him, and instead deprived him of his rights and defamed him.

127. Due to the acts of the Defendants over decades, Mr. Coley has suffered extreme and severe mental anguish as well as mental and physical pain and injury. For such injuries, Mr. Coley will incur significant damages based on psychological and medical care.

128. Additionally, as a result of Mr. Coley's wrongful incarceration, his long-term cardiac health was compromised, he suffered and continues to suffer from physical deformities and disabilities, and his worsening liver condition put him at high risk of cirrhosis of the liver, resulting in a high risk for heart attacks, future disability, cancer, and death.

129. As a further result of the conduct of each of these Defendants, Mr. Coley has lost past and future earnings in an amount to be determined according to proof at trial. Prior to his conviction, Mr. Coley was enlisted in the United States Navy and then consistently employed after his honorable discharge. Due to his wrongful

incarceration, he lost all opportunities for educational and career advancement, including the related loss of income for almost his entire adult life.

130. As a further result of the conduct of each of these Defendants, Mr. Coley was deprived of familial relationships, including not being able to get married and raise a family, care for his ailing parents, or attend their funerals.

131. These injuries and damages to Mr. Coley were foreseeable to Defendants at the time of their acts and omissions.

132. Pursuant to California Government Code § 825(a), Defendants are entitled to indemnification because their individual liability and acts of misconduct arose from acts and/or omissions within the course and scope of their employment with Ventura County.

133. The aforementioned acts of the Defendants were willful, wanton, malicious, oppressive, in bad faith or done with reckless disregard or with deliberate indifference or with gross negligence to Mr. Coley's constitutional rights, entitling him to exemplary and punitive damages from each Defendant in an amount to be proven at the trial of this matter.

134. By reason of the above described acts and omissions of Defendants, Mr. Coley was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Mr. Coley that he might vindicate the loss and impairment of his rights, and by reason thereof, Mr. Coley requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**X.    FIRST CLAIM FOR RELIEF: 42 U.S.C. § 1983 CLAIM FOR DEPRIVATION OF DUE PROCESS OF LAW AND VIOLATION OF RIGHT TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT**

*Against Individual Defendants Estate of Frederick Jones, Henderson, Vasquez, Fort, Taylor, Schwarz, Sullivan, Vanni, Haney, and Does 1-10*

135. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

136. Defendants, acting individually and in concert with each other and/or with Klamser and others not named herein, fabricated false evidence, suppressed or destroyed exculpatory evidence, failed to investigate in a manner that shocks the conscience, and instead followed through with the unlawful prosecution of Mr. Coley, thereby violating Mr. Coley's right not to be deprived of liberty without due process of law.

137. The false evidence asserted herein is comprised of material omissions as well as affirmatively false and misleading statements in police reports, documents, and testimony prepared or given in connection with the investigation of the Wicht murders.

138. Defendants' misconduct, acting individually and/or in concert with Klamser and others not named herein, further includes but is not limited to the planting of physical evidence and false oral and written reports made to cover up the planting of that evidence.

139. Defendants' misconduct, acting individually and/or in concert with Klamser and others not named herein, further includes but is not limited to destroying and/or suppressing exculpatory and potentially exculpatory evidence.

140. Defendants' misconduct, acting individually and/or in concert with Klamser and others not named herein, further includes but is not limited to reckless investigatory misconduct such as disregarding clear information incriminating more

obvious suspects like Bowyer, Ireton, and Mobley, all of whom spent time with the victims just prior to their murders and were connected to the murder scene via forensic evidence including fingerprints, public hairs, and semen, and all of whom had no alibis at the time of the murders.

141. Each Defendant knew or should have known the evidence was false, and the Defendants' conduct was intentional and knowing, or alternatively done with deliberate indifference to and/or reckless disregard for Plaintiff's rights or for the truth.

142. Defendants' misconduct did not cease with Mr. Coley's conviction but continued through his exoneration, thereby prolonging his wrongful incarceration.

143. The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to not have false evidence used against him is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

144. The claim against the County of Ventura contained in Claim #6 for *Monell* liability specifically incorporates within the deficient policies, custom and practice alleged in Claim #6 the allegations of this Claim.

145. Defendants were each jointly and severally responsible to not use false evidence against Mr. Coley. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

146. As a direct and proximate result of Defendants' actions, Mr. Coley was wrongly arrested, detained, prosecuted, convicted, and incarcerated for more than thirty-nine years and suffered other grievous injuries and damages set forth above.

147. Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was vacated by the Ventura County Superior Court on November 29, 2017. *Heck v. Humphrey*, 512 U.S. 477 (1994).

## XI.    SECOND CLAIM FOR RELIEF: 42 U.S.C. § 1983 CIVIL RIGHTS CONSPIRACY CLAIM

*Against Individual Defendants Estate of Frederick Jones, Henderson, Vasquez, Fort, Taylor, Schwarz, and Does 1-10*

148. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

149. Defendants and other not named herein, including Klamser, agreed among themselves to act in concert to deprive Mr. Coley of his clearly established constitutional rights as protected by the Fourth, Fifth, and Fourteenth Amendments, including his right to be free from illegal seizure.

150. As described above, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

a.  acting in concert to plant false inculpatory evidence and produce false written and oral reports to cover up this misconduct;

b.  acting in concert to suggest, coerce, and/or fabricate statements regarding the time of the crime from Glenn Watkins;

c.  acting in concert to suggest, coerce, and/or fabricate an identification of Mr. Coley's vehicle by witness Debbie Villafrancas;

d.  acting in concert to suggest, coerce, and/or fabricate false inculpatory statements by Bonnie Castillo;

e.  acting in concert to conceal, suppress, and/or destroy exculpatory evidence, including physical and forensic evidence; and

f.  acting in concert to suppress, withhold, or otherwise fail to investigate evidence inculpating other more likely suspects without alibis.

151. The claim against the County of Ventura contained in Claim #6 for *Monell* liability specifically incorporates within the deficient policies, custom and practice alleged in Claim #6 the allegations of this Claim.

152. As a direct and proximate result of Defendants' overt acts, Mr. Coley was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over thirty-nine years; and subjected to other grievous injuries and damages set forth above.

153. Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was vacated by the Ventura County Superior Court on November 29, 2017. *Heck v. Humphrey*, 512 U.S. 477 (1994).

## XII. THIRD CLAIM FOR RELIEF: 42 U.S.C. § 1983 CLAIM PURSUANT TO *BRADY, GARCIA*, AND *MOODY* FOR FAILURE TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE

*Against Individual Defendants Henderson, Vasquez, Fort, Taylor, Schwarz, Sullivan, Vanni, Haney, and Does 1-10*

154.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

155. Defendants, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to material exculpatory evidence and information as required *by Brady v. Maryland*, 373 U.S. 83 (1963) (hereafter *Brady* information), *People v. Garcia,* 17 Cal. App. 4th 1169 (1992) (hereafter *Garcia* information), and *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) (hereafter *Moody* information).

156. Pursuant to *Brady, Garcia*, and *Moody*, Defendants failed to disclose exculpatory evidence to the prosecutors handling Mr. Coley's case and/or to turn

over exculpatory evidence to Mr. Coley's defense attorneys, the conviction court, the sentencing court, the court of appeals or post-conviction court so that it could be used to prove Mr. Coley innocence or secure his release from his wrongful imprisonment, including exculpatory evidence that was known at the time of trial and sentencing and new exculpatory evidence discovered after Mr. Coley's wrongful conviction and the event of his sentencing.

157. This failure to disclose exculpatory evidence encompassed not only the pretrial and trial period, but the period after Mr. Coley's conviction, including the period of the appeal and Mr. Coley's post-conviction efforts to exonerate himself or find exculpatory evidence he could use for that purpose.

158. The actions of each Defendant, acting individually and/or in concert, in withholding evidence were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

159. The constitutional source of the obligation to provide *Brady*, *Garcia*, and *Moody* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to such exculpatory information is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

160. Defendants were each jointly and severally responsible to provide *Brady, Garcia*, and *Moody* information to the prosecutors handling Mr. Coley's case so that it could in turn be provided to Mr. Coley's defense team. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

161. The claim against the County of Ventura contained in Claim #6 for *Monell* liability specifically incorporates within the deficient policies, custom and practice alleged in Claim #6 the allegations of this Claim.

162. As a direct and proximate result of Defendants' conduct, Mr. Coley was wrongly incarcerated for over 39 years and subjected to other grievous injuries and damages set forth above.

163. Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was vacated by the Ventura County Superior Court on November 29, 2017. *Heck v. Humphrey*, 512 U.S. 477 (1994).

**XIII.     FOURTH CLAIM FOR RELIEF: 42 U.S.C. § 1983 CLAIM FOR POST-TRIAL SUPPRESSION OF EXCULPATORY EVIDENCE**

*Against Individual Defendants Vanni, Sullivan, Haney, and Does 1-10*

164. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

165. From 2003-2016, Defendants with reckless disregard or deliberate indifference to Mr. Coley's rights, withheld material exculpatory evidence by intentionally and/or recklessly misrepresenting that forensic evidence capable of testing no longer existed.

166. Mr. Coley had a liberty interest in proving his innocence, including through newly discovered exculpatory evidence.

167. The Ventura County District Attorney's Office and its employees, including DDA Haney, and the Ventura County Sheriff's Office and its employees, including Vanni, Sullivan and Haney, were aware of and had responsibility in some form to respond to Mr. Coley's request in 2003 for DNA testing. In response to that request, Mr. Coley was told that all forensic evidence had been destroyed. This was false. In fact, that evidence was available, but Defendants affirmatively

misrepresented and/or recklessly failed to conduct a proper search that would have resulted in the disclosure of said evidence.

168. Defendants' misconduct deprived Mr. Coley of powerful new evidence of innocence under Cal. Pen. Code §1405 that he did not have until its belated disclosure in 2017. With that critical evidence, an earlier motion for post-conviction relief would have been successful and freed Mr. Coley from prison.

169. Defendants' misconduct deprived Mr. Coley of his liberty without due process of law and deprived Mr. Coley access to the courts in violation of the Fourteenth Amendment to the United States Constitution.

170. The claim against the County of Ventura contained in Claim #6 for *Monell* liability specifically incorporates within the deficient policies, custom and practice alleged in Claim #6 the allegations of this Claim.

171. As a direct result of Defendants' misconduct, Mr. Coley's incarceration was wrongfully extended, and Mr. Coley suffered physical, emotional, and pecuniary damages.

172. Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was vacated by the Ventura County Superior Court on November 29, 2017. *Heck v. Humphrey*, 512 U.S. 477 (1994).

**XIV.    FIFTH CLAIM FOR RELIEF: 42 U.S.C. § 1983 SUPERVISORY LIABILITY CLAIM**

*Against Ventura County and Does 1-10*

173. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

174. Defendant Ventura County while acting under color of law, failed to provide reasonable security, monitoring, training and supervision of his employees, in particular of their investigators and criminologists in proper investigative techniques and the constitutional requirements for such investigations.

175. Defendant Ventura County and Does 1-10, while acting under color of law, knew, or in the exercise of reasonable care, should have known of a history and propensity and pattern at the time of this incident for Defendant Klamser to engage in the unconstitutional conduct enumerated above, including fabricating evidence, withholding exculpatory evidence, manipulating witnesses and otherwise violating the rights of criminal suspects of Defendants. Defendants took no action to prevent this unconstitutional conduct.

176. Defendants' disregard of this knowledge or failure to adequately investigate and discover and correct such acts or failures to act was a moving force which caused the violation of Mr. Coley's constitutional rights.

177.  Defendants knew, or in the exercise of reasonable care should have known, of a pattern or practice of unconstitutional violations, or the existence of facts which create the potential of unconstitutional acts, and these Defendants (including Ventura County) had a duty to train and instruct their subordinates to prevent similar acts but failed to take steps to properly train, supervise, investigate or instruct their agents or employees.

178.  The claim against the County of Ventura contained in Claim #6 for *Monell* liability specifically incorporates within the deficient policies, custom and practice alleged in Claim #6 the allegations of this Claim.

179. As a direct and proximate result of the conduct of Ventura County and Does 1-10, as described above, Mr. Coley suffered constitutional deprivations and grievous personal injuries and damages described above.

180. Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was vacated by the Ventura County Superior Court on November 29, 2017. *Heck v. Humphrey*, 512 U.S. 477 (1994).

/ / /

/ / /

44

**XV.    SIXTH CLAIM FOR RELIEF: 42 U.S.C. §1983 *MONELL* CLAIM FOR VIOLATIONS ARISING FROM A POLICY/CUSTOM OF FAILING TO PRESERVE AND DISCLOSE EXCULPATORY EVIDENCE, FABRICATING EVIDENCE, FAILING TO TRAIN AND SUPERVISE REGARDING THE PRESERVATION AND DISCLOSURE OF EVIDENCE IN HOMICIDE INVESTIGATIONS**

*Against Defendant Ventura County*

181. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

182.   Plaintiff is informed and believes and thereon alleges that, during all or portions of the period relevant to this case (1978 to 2017), Defendant County of Ventura, by and through the Ventura County District Attorney's Office, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had a) no established or clear administrative system in place, b) no stated, written or adequate policies, and c) no or inadequate training and supervisions regarding, *inter alia*, the following issues:

    a.    Ensuring that any police department or police officers with which the District Attorney's Office was working provided all exculpatory evidence gathered during an investigation of a case presented to the District Attorney's Office for prosecution, as numerous cases over the years made clear was its obligation.

    b.    Ensuring that any police department or police officers with which the District Attorney's Office was working provided its full investigative material and that material is actually reviewed by an appropriate Deputy DA.

    c.    Ensuring that exculpatory evidence was not buried in files provided to the trial attorney handling the case by the police

department or police officers with which the District Attorney's Office was working, and/or by members of its Office.

d.    Ensuring that the police department or police officers with which the District Attorney's Office was working provided to the trial attorney prosecuting that case full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense.

e.    Ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the District Attorney's Office, including the attorney assigned to try the case, and/or disclosed to the defense.

f.    Ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases.

g.    Ensuring that the key police reports and other key case documents provided full and complete descriptions of witness interactions and called attention to any irregularities, deviations from policy or evidence favorable to the defense.

h.    Ensuring that exculpatory evidence learned or discovered after trial and conviction (including between trial and sentencing and after sentencing) was disclosed to defendants and their counsel.

i.    Ensuring that exculpatory information known to Deputy District Attorneys would be identified, organized and maintained for production to the California Attorney General's Office for litigation in subsequent post-trial habeas and appellate proceedings.

j.     Establishing procedures or systems to track or identify known false witness statements or other known facts that would make them unsuitable as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used as witnesses.

k.     Ensuring that policies, procedures, systems, training and supervision were in place to ensure that the rights of convicted individuals to test physical evidence for DNA evidence pursuant to Cal. Pen. Code §1405 existed and were properly implemented.

l.     Failing to discipline personnel involved in dishonesty, particularly in enabling, encouraging, condoning or presenting false testimony that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused.

m.     Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the DA after the preliminary hearing stage is provided to the defense.

n.     Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the DA after a conviction is provided to the defense.

183. Defendant County of Ventura, by and through the Ventura District Attorney's Office, had the habit, custom, pattern and practice, during all or parts of the relevant time period (1978 to the present) of:

a.     Failing to identify or disclose exculpatory evidence or false evidence, particularly regarding Detective Klamser's conduct to withhold exculpatory evidence and to falsify evidence, as previously alleged.

47

b.    Failing to locate physical evidence for DNA testing to which convicted inmates were entitled under Cal. Pen. Code §1405.

c.    Entering into benefits agreements with key witnesses without disclosing them to the defense, and/or failing to identify and disclose such agreements.

d.    Improperly influencing eyewitness identifications by manipulation of witness or providing undisclosed benefits to them.

184. The customs, policies, practices, failures, actions and inactions of the Ventura District Attorney's Office elaborated above were or should have been known to the policy makers responsible for the Ventura District Attorney's Office and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the Ventura District Attorney's Office and its policy makers were on notice of these deficiencies and failures.

185. The customs, policies, practices, failures, actions and inactions of the Ventura District Attorney's Office elaborated above were so closely related to the deprivation of Mr. Coley's rights as to be a moving force that caused the constitutional violations alleged herein.

186. As a direct and proximate result of Defendant County of Ventura' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of district attorney's acts and omissions alleged above, Mr. Coley sustained injury and damage to be proved at trial.

187. Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was invalidated

by the Ventura County Superior Court on November 29, 2017. *Heck v. Humphrey*, 512 U.S. 477 (1994).

## XVI. SEVENTH CLAIM FOR RELIEF: NEGLIGENT SUPPRESSION/WITHHOLDING OF EVIDENCE

*Against Individual Defendants Estate of Frederick Jones, Henderson, Vasquez, Fort, Taylor, Schwarz, Sullivan, Vanni, Haney and Does 1-10*

188. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

189. Defendants had ongoing legal, constitutional, and statutory duties that obligated them to preserve, not destroy, and turn over evidence to Mr. Coley, including DNA evidence requested by Mr. Coley. Under California State law, in particular, Ventura County violated California Government Code § 815.6 through its patently negligent "search" for the physical evidence Mr. Coley requested for DNA testing. Under § 815.6, an entity has direct liability where it is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury and it fails to discharge that duty with reasonable diligence.

190. Defendants had explicit notice of the numerous motions, post-conviction petitions, and requests for information and physical evidence made by Mr. Coley and others. By taking no or insufficient actions despite the ever-growing mountain of evidence that proved that Mr. Coley was actually innocent and was being wrongfully imprisoned, Ventura County is liable for negligence or gross negligence. Ventura County is likewise liable for negligence or gross negligence for its misrepresentations to Mr. Coley that there was no DNA evidence available to retest. Ventura County indisputably failed to exercise reasonable diligence in its search for the evidence requested by Mr. Coley.

191. As a direct and proximate cause of Defendants recurring failure to come forward with exonerating evidence in their possession, Mr. Coley suffered exposure to prison conditions and avoidable physical, mental, and pecuniary injuries, for

which Ventura County is liable. Absent such negligence/gross negligence, Mr.
Coley would have been able to establish both the violation of his rights and his
innocence years earlier and would have been released from custody many years
earlier than he was.

192. Because these claims necessarily imply the invalidity of Mr. Coley's
murder conviction, they were barred until Mr. Coley's conviction was vacated by
the Ventura County Superior Court on November 29, 2017. *Yount v. City of
Sacramento*, 43 Cal. 4th 885, 902, 183 P.3d 471, 484 (Cal. 2008).

**XVII.    EIGHTH CLAIM FOR RELIEF: CLAIM UNDER CALIFORNIA
CODE § 815.2 FOR RESPONDEAT SUPERIOR AND
VICARIOUS LIABILITY INCLUDING FOR NEGLIGENT
SUPERVISION AND TRAINING**

*Against Defendant Ventura County and Does 1-10*

193. Plaintiff realleges all the foregoing and any subsequent paragraphs
contained in the complaint, as if fully set forth herein.

194.  California state law provides that public entities are directed to pay any
tort judgment for any claim or action against an employee of the public entity for an
injury arising out of an act or omission occurring within the scope of his or her
employment.

195.  Defendants are or were employees of Ventura County, and acted
within the scope of their employment in committing the acts and omissions
described herein.

196. Supervisory Defendants named herein, and other supervisory personnel
whose identities are not currently known, had a duty to ensure that law enforcement
and prosecutorial personnel under their supervision conducted criminal
investigations and prosecutions in a manner that complied with constitutional
protections for those facing criminal charges, including the right to a fair trial and to
the proper preservation, tracking and location of evidence, including actual or
potential exculpatory evidence. Supervisory Defendants named herein, and other

supervisory personnel whose identities are not currently known failed to properly supervise and train employees in (a) ensuring that exculpatory evidence is provided and disclosed to those facing criminal charges, (b) in ensuring that false evidence is not used in any investigation or prosecution, (c) in locating evidence to which individuals are entitled for purposes of DNA testing under Cal. Pen. Code §1405, and (d) otherwise complying with their responsibilities as set forth in the Seventh Claim for Relief. Defendant Ventura County has respondeat superior liability for all such failures to supervise and train. It was at all times reasonably foreseeable that such failures to train and supervise would result in the violation of criminal defendants' right to a fair trial and the prosecution and conviction of innocent persons for crimes they did not commit.

197.   Defendant Ventura County is legally obligated to pay any judgment entered against Defendant Officers.

198.  Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was vacated by the Ventura County Superior Court on November 29, 2017. *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902, 183 P.3d 471, 484 (Cal. 2008).

## XVIII.    NINTH CLAIM FOR RELIEF: CLAIM UNDER CALIFORNIA CODE § 52.1

*Against Ventura County, All Individual Defendants,
and Does 1-10*

199.   Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

200. Defendants interfered or attempted to interfere with Mr. Coley's rights secured by the United States and California constitution and laws, including through the use of threats, intimidation, or coercion.

201. As a direct and proximate cause of Defendants recurring failure to come forward with exonerating evidence in their possession, Mr. Coley suffered exposure

51

to prison conditions and avoidable physical, mental, and pecuniary injuries, for which Ventura County is liable.

202. Because these claims necessarily imply the invalidity of Mr. Coley's murder conviction, they were barred until Mr. Coley's conviction was vacated by the Ventura County Superior Court on November 29, 2017. *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902, 183 P.3d 471, 484 (Cal. 2008).

## XIX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Craig Coley requests relief on his own behalf as follows, and according to proof, against each Defendant:

1. General and compensatory damages in an amount according to proof;

2. Special damages in an amount according to proof;

3. Exemplary and punitive damages against each Defendant in an amount according to proof that will deter such conduct by Defendants in the future;

4. Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

5. Such other relief as may be warranted or as is just and proper.


DATED: July 19, 2019                    Respectfully submitted,


                                        KAYE, McLANE, BEDNARSKI &
                                        LITT, LLP

                                        By: */ s / Barrett S. Litt*_____

                                        BARRETT S. LITT
                                        RONALD O. KAYE
                                        LINDSAY BATTLES

                                        Attorneys for Plaintiff
                                        Craig Coley

52

1

2         NEUFELD, SCHECK & BRUSTIN,
          LLP
3

4         By*: / s / Nick Brustin*   

5

6         NICK BRUSTIN
          PETER NEUFELD
7         ANNA BENVENUTTI HOFFMANN
          KATIE MCCARTHY
8

9         Attorneys for Plaintiff
          Craig Coley
10

11        **JURY DEMAND**

12

13    Trial by jury of all issues is demanded.

14 DATED: July 19, 2019    Respectfully submitted,

15

16         KAYE, McLANE, BEDNARSKI &
          LITT, LLP
17

18         By*: / s / Barrett S. Litt*   

19

20         BARRETT S. LITT
          RONALD O. KAYE
21         LINDSAY BATTLES

22         Attorneys for Plaintiff
          Craig Coley
23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NEUFELD, SCHECK & BRUSTIN,
LLP

By: / s / Nick Brustin_____

NICK BRUSTIN
PETER NEUFELD
ANNA BENVENUTTI HOFFMANN
KATIE MCCARTHY

Attorneys for Plaintiff
Craig Coley